## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

The Toro Company,                                    Civil No. 23-3873 (DWF/ECW)

        Plaintiff,

v.                                                   **MEMORANDUM**
                                                     **OPINION AND ORDER**

Steve Sutterlin, Tim Angel, Yakta Inc.,
*doing business as Yakta Mowers*,

        Defendants.

_____

Nathan T. Boone, Esq., Patrick R. Martin, Esq., Ogletree, Deakins, Nash, Smoak &
Stewart, P.C., counsel for Plaintiff.

Christopher Michael Santomassimo, Esq., Paul Salvatoriello, Esq., Santomassimo Davis
LLP; Theodore J. Waldeck, Esq., Waldeck Law Firm PA, counsel for Defendants.
_____

## INTRODUCTION

This matter is before the Court on Defendants Steve Sutterlin, Tim Angel, and

Yakta, Inc.'s motion to dismiss. (Doc. No. 12.) Plaintiff Toro Company opposes the

motion. (Doc. No. 29.) Also before the Court is Toro Company's motion for a

temporary restraining order and/or preliminary injunction. (Doc. No. 18.) Defendants

oppose the motion. (Doc. No. 32.) For the reasons set forth below, the Court grants in

part and denies in part Defendants' motion to dismiss and grants in part and denies in part

Toro Company's motion for temporary restraining order ("TRO") and/or preliminary

injunction.

# BACKGROUND

Defendants Steve Sutterlin and Tim Angel both worked at Toro Company selling zero-turn Spartan Mowers. (Doc. No. 1 ("Compl.") ¶¶ 5-6.) On August 25, 2023, Sutterlin and Angel both resigned and immediately began working for Yakta Mowers. (*Id.*) Yakta Mowers is a Manitoba, Canada corporation with its principal place of business in Winnipeg. (*Id.* ¶ 3.)

Initially, Sutterlin was a sales manager for Intimidator, LLC. (*Id.* ¶ 23.) In January 2022, Toro Company purchased Intimidator. (*Id.* ¶ 27.) As part of the transition, Sutterlin was both asked to sign a Confidentiality, Invention, and Non-Compete Agreement. (*Id.* ¶ 28.) Sutterlin received a $6,000 bonus for signing the Agreement (*Id.* ¶ 31). The Agreement was a condition of Angel's employment.[1]

The Agreements prohibited Sutterlin and Angel from "using or disclosing any Confidential Information belonging to [Toro Company]," including customer lists and dealer or distributer information. (*Id.* ¶¶ 36-37.) The Agreements included a one-year non-compete provision that prohibited Sutterlin and Angel from doing similar business in a geographic area over which they did business with Toro Company or Intimidator in the last three years of their employment. (*Id.* ¶ 36.) Moreover, the Agreements prohibited Sutterlin and Angel from "calling upon or soliciting the customers, vendors, or suppliers of [Toro Company] that had business-related contact with Sutterlin and Angel during

---

[1]     The Complaint incorrectly states that Angel received a $6,000 bonus for signing the Agreement; however, Toro Company has since clarified that Angel did not receive a bonus as "he was being hired as a new employee." (Doc. No. 39 ¶ 4.)

their last three years of employment." (*Id.*)  Sutterlin and Angel were also prohibited for one year from intentionally interfering with Toro Company's business relationships or employing or attempting to employ Toro Company's employees. (*Id.*)  The Agreements provided that any claims arising from the Agreements apply Arkansas law and be litigated exclusively in Minnesota. (*Id.* ¶ 39.)

Through their work at Toro Company, Angel and Sutterlin were introduced to Toro Company's dealer network. (*Id.* ¶ 42.)  In Sutterlin's last three years with Toro Company, he covered Ohio, Kentucky, western West Virginia, and Indiana. (*Id.* ¶¶ 44-45.)  For Dealers A, B, and C in Indiana, Sutterlin made sales of over $2,400,000 over his last three years of employment. (*Id.* ¶ 46.)  Angel covered North Carolina, South Carolina, Virginia, Maryland, Delaware, and eastern West Virginia. (*Id.* ¶ 51.)  For Dealers D, E, F, and G, Angel made sales of over $4,444,000 over his last three years of employment. (*Id.* ¶ 53.)  Under the Agreements, Sutterlin cannot directly, or through the direction of others, solicit, call upon, or provide services to Dealers A, B, C for one year, and Angel cannot do so for Dealers D, E, F, and G. (*Id.* ¶¶ 56-57.)

In summer 2023, Sutterlin and Angel were considering leaving Toro Company and working for Yakta. (*Id.* ¶¶ 63-64.)  Sutterlin traveled to Winnipeg to meet with Yakta. (*Id.* ¶ 63.)  Angel asked Sutterlin how the meeting went, and Sutterlin texted a picture of a Yakta baseball hat. (*Id.* ¶ 64.)  Angel replied, saying that his "passport is good til July 2024" to which Sutterlin responded, "You will use [your passport] a bunch here." (*Id.*)  In June, Angel sent an email from his Toro Company email address to his personal email address, attaching spreadsheets that included information concerning 277 mower dealers

3

in South Carolina, North Carolina, Virginia, and West Virginia, including Toro Company dealers, and a spreadsheet with 156 prospective dealers.  (*Id.* ¶ 67.)

On June 27, Sutterlin texted Angel that Dealer C "committed to 36 Yakta."  (*Id.* ¶ 69.)  That same day, Angel texted Sutterlin that "[t]his is a big deal.  We could crush Spartan and really hurt toro lol."  (*Id.* ¶ 71.)  Sutterlin also texted Angel that he was going to "erase this phone before I give it back.  They will use these texts against us if they can get through them."  (*Id.* ¶ 72.)

The following month, while still employed at Toro Company, Sutterlin and Angel sent a series of texts that Toro Company alleges outlines a solicitation by proxy scheme. (*Id.* ¶ 61.)  Specifically, Sutterlin texted Angel that he would sign up a "dealer in Indiana," but "[i]t will just have somebody else's signature on it."  (*Id.*)  Sutterlin also texted that they were "going to be servicing other states initially," but that he would "be doing all of [Angel's] contacts or someone will."  (*Id.*)  Sutterlin told Angel that Angel could "come into Ohio and Kentucky and sell Yakta" and said that Angel could tee up dealers for him in North Carolina and Virginia.  (*Id.*)  Toro Company alleges that this is a direct violation of the Agreements.  (*Id.*)

In August 2023, prior to his resignation, Angel texted Dealer D and asked if they would get dinner with him.  (*Id.* ¶ 79.)  Toro Company believes that "Angel pitched Dealer D . . . about becoming a Yakta dealer."  (*Id.*)  Angel texted another dealer a few days later to set up a dinner.  (*Id.* ¶ 80.)  Angel and Sutterlin resigned from Toro Company about a week later.  (*Id.* ¶ 81.)  Currently, Dealers A, B, C, D, E, F, and G are listed as Yakta dealers.  (*Id.* ¶ 82.)  In November 2023, Sutterlin also called a Toro

4

Company sales employee and "asked what it would take to find a remote job for her working for Yakta." (*Id.* ¶ 1.)

Sutterlin sent a copy of the Agreement to Yakta. (*Id.* ¶ 87.) Toro Company alleges that presumably Angel did the same. (*Id.*) Thus, Toro Company asserts that Yakta was aware of the terms of the Agreements and "encourag[ed] and/or allow[ed] Sutterlin and Angel to engage [Toro Company] dealers for the purpose of becoming Yakta dealers in violation of their agreements." (*Id.* ¶ 111.)

Toro Company brought this action against Sutterlin, Angel, and Yakta, alleging claims of breach of contract and breach of the duty of loyalty and unfair competition against Sutterlin and Angel and tortious interference with contractual relationship against Yakta. Defendants now move to dismiss the complaint, and Toro Company moves for a TRO or preliminary injunction against Defendants.

## DISCUSSION

### I.     Motion to Dismiss

Defendants move to dismiss the complaint. They argue that (1) the Court lacks subject matter jurisdiction, as Toro Company has failed to meet the amount-in-controversy requirement; (2) the Court lacks personal jurisdiction over Yakta; and (3) Toro Company has failed to state a claim against Yakta.

### A.     Subject Matter Jurisdiction

Defendants first assert that Toro Company has failed to meet the amount-in-controversy requirement. "The proponent of diversity jurisdiction has the burden of proving that the amount in controversy exceeds the jurisdictional minimum." *Bell v.*

*Hershey Co.*, 557 F.3d 953, 956 (8th Cir. 2009). The amount in controversy asserted by the plaintiff in the complaint controls "unless the defendant can establish to a legal certainty that the claim is for less than the jurisdictional minimum." *Id.*

Toro Company alleges that Sutterlin and Angel signed Agreements which prohibited them, for a period of one year, from directly or through the direction of others doing similar business in the geographic area over which they did business for Toro Company in the last three years and further prohibited them from soliciting the customers or vendors of Toro Company that had business-related contact with Sutterlin and Angel in their last three years. Toro Company then uncovered texts in which Sutterlin and Angel essentially suggested swapping dealers. In other words, Sutterlin suggested that Angel tee up his prior dealers in North Carolina or Virginia and have Sutterlin "close[] them for [Angel]." (Compl. ¶ 1.) Thus, Toro Company alleges that Sutterlin and Angel engaged in a solicitation by proxy scheme. Moreover, Toro Company alleges that while working for Toro Company, Sutterlin negotiated the sale of Yakta mowers with Dealer C. (*Id.*) And Toro Company alleges that Angel met with two dealers while still working at Toro Company to sell Yakta mowers to them. (*Id.*)

Sutterlin worked with Dealers A, B, and C while working at Toro Company. (*Id.* ¶ 9.) Toro Company alleges that Sutterlin sold $2,400,000 worth of mowers to these dealers in his last three years with Toro Company. (*Id.*) Angel worked with Dealers D, E, F, and G while working at Toro Company. (*Id.* ¶ 53.) Toro Company alleges that Angel sold $4,444,000 worth of mowers to these dealers in his last three years with Toro Company. (*Id.*) Dealers A, B, C, D, E, F, and G are now listed as Yakta dealers, and

Toro Company alleges that Yakta has obtained these dealers as a result of Sutterlin and Angel's breach of their Agreements with Toro Company. Toro Company further alleges that any business that Sutterlin or Angel have done or will do with these dealers on behalf of Yakta is the result of this solicitation by proxy scheme.

For purposes of the amount-in-controversy requirement, the Court concludes that Sutterlin and Angel's past performance with these exact dealers can be used to estimate the value of Toro Company's claims against Sutterlin and Angel. Toro Company alleges that Sutterlin and Angel have teed-up their prior dealers for each other and, thus, their past performance with these dealers can be used as a reasonable estimate of sales Sutterlin and Angel will make with these dealers if they continue to violate their Agreements with Toro Company. *See Young v. Arthur J. Gallagher & Co.*, No. 21-cv-1408, 2022 WL 37470, at *4 (D. Minn. Jan. 4, 2022) (concluding that the plaintiff could rely on past performance with the same customers to estimate the "compensation that [the plaintiff] would earn if the non-solicitation provision did not prohibit her from soliciting previous clients"). Defendants have failed to establish to a legal certainty that the claims are worth less than $75,000. The Court thus concludes that it has subject matter jurisdiction over the complaint.

### B.    Personal Jurisdiction

Defendants next assert that the Court does not have personal jurisdiction over Yakta because Toro Company has failed to allege sufficient contacts between Yakta and the forum state. Defendants allege that Yakta has had no contact with Minnesota related to the case. In response, Toro Company asserts that (1) Yakta knew about the

7

Agreements which contained a forum-selection clause, (2) Defendants "have all joined together in a common interest in defending this lawsuit," and (3) Yakta has become "'closely related' to Sutterlin and Angel such that their explicit consent to a Minnesota forum-selection clause results in Yakta's implicit consent to personal jurisdiction in Minnesota."  (Doc. No. 29 at 14-15.)

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that personal jurisdiction exists."  *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011).  In diversity jurisdiction cases, personal jurisdiction exists "only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause."  *Id.* at 592 (internal quotations and citation omitted).  Minnesota's long-arm statute extends personal jurisdiction as far as the Due Process Clause allows.  *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 411 (1992).  "Due Process requires that the defendant purposefully establish minimum contacts in the forum state such that asserting personal jurisdiction and maintaining the lawsuit against the defendant does not offend traditional conceptions of fair play and substantial justice."  *K-V Pharm. Co.*, 648 F.3d at 592 (internal quotations and citation omitted).

Toro Company argues that Yakta has impliedly consented to jurisdiction in Minnesota because Yakta is closely related to the dispute between Toro Company, Sutterlin, and Angel and therefore it was foreseeable that Yakta would be bound by the forum-selection clauses of the Agreements, despite Yakta being a non-signatory of those Agreements.  "A non-contracting party may be bound by an agreement if it is 'closely

related to the dispute such that it becomes foreseeable that it will be bound.'" *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 932 (D. Minn. 2016) (quoting *Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001)).

The purpose of the closely related doctrine is to "give[] parties who have come to an agreement the ability to enforce that agreement against the universe of entities who should expect as much—successors-in-interest, executive officers, and the like—without being overly persnickety about who signed on the dotted line." *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 337 (S.D.N.Y. 2018). The only Eighth Circuit case which has addressed the closely-related doctrine illustrates the narrowness of the doctrine. In *Marano*, the Eighth Circuit concluded that because Leon Marano was "a shareholder, officer, and director of Marano Enterprises, which *was* a party to the agreements," Leon Marano was therefore "closely related to the disputes arising out of the agreements and properly bound by the forum-selection provisions." *Marano*, 254 F.3d at 757 (internal quotations and citation omitted) (emphasis in original). Moreover, Leon Marano "joined with Marano Enterprises" and brought suit against the defendant and was thus "a voluntary plaintiff." *Id.* at 757-58. The Court held that "[a]s a voluntary plaintiff," Leon Marano was not able to then "object to jurisdiction limited to the venue(s) to which his co-plaintiffs agreed." *Id.* at 758.

This case is markedly different from *Marano*. Yakta is not a "shareholder, officer, or director" of Toro Company, nor is Yakta a voluntary plaintiff in this litigation. The Court has serious concerns about extending the closely-related doctrine to Yakta, an entity that has no legal relationship with the parties—aside from a new employer-

employee relationship with Sutterlin and Angel, was in no way affiliated with the parties at the time the Agreements were negotiated, has not brought suit against Toro Company related to the Agreements, was not involved in negotiating the Agreements, has not benefited from the Agreements, and never had signatory status or control over the signatories of the Agreements.  Moreover, Yakta does not have minimum contacts with Minnesota, a fact that is not disputed by Toro Company.  Thus, the Court is left with due process concerns.

Toro Company asserts that the Court need not address due process concerns because, under the closely-related doctrine, Yakta has impliedly consented to personal jurisdiction in Minnesota.  Toro Company relies on a footnote in *Burger King* which states that "a litigant may give express or implied consent to the personal jurisdiction of the court."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (internal quotations and citation omitted).  The Supreme Court then went on to note that forum-selection clauses do not offend due process when they are "freely negotiated" and are not "unreasonable and unjust."  *Id.*  Toro Company takes this statement out of context, as the Supreme Court's comments about forum-selection clauses refers to express consent to personal jurisdiction based on a "freely negotiated" forum-selection clause.  Here, there is no dispute that Yakta did not "freely negotiate[]" the forum-selection clauses in the Agreements.  Thus, the Court does not believe it can simply abandon its due process concerns.

This case is also distinguishable from the other cases in this district that Toro Company has relied upon.  In *C.H. Robinson Worldwide, Inc. v. Rodriquez*,

No. 12-cv-264, 2012 WL 4856245, at *6 (D. Minn. Oct. 12, 2012), the third party was a voluntary plaintiff in a separate action, seeking a "declaration of its rights under the Agreement."  Similarly, in *ELA Med., Inc. v. Arrhythmia Mgmt. Assocs., Inc.*, No. 06-cv-3580, 2007 WL 892517, at *6 (D. Minn. Mar. 21, 2007), the third party filed suit and "expressly sought" a declaration of the signatories' rights under the Agreement. In *Medtronic, Inc. v. Endologix, Inc.*, 530 F. Supp. 2d 1054 (D. Minn. 2008), the third party attempted to remove the action to federal court and thus the issue "was not whether personal jurisdiction existed."  *ProMove, Inc. v. Siepman*, 355 F. Supp. 3d 816, 822 (D. Minn. 2019).  And in *St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.*, the third party "was a willing party" in a separate action related to the contracting parties' rights under the agreements and thus the third party "arguably acquiesc[ed] in the forum-selection clauses within those agreements."  No. 12-cv-621, 2012 WL 1576141, at *5 (D. Minn. May 4, 2012) (quoting *Marano*, 254 F.3d at 757-58).  Moreover, in a more recent case, the court again declined to conclude that the non-signatory was a closely-related party in part because the entity "did not voluntarily join [the contracting party] in any litigation."  *Ernst*, 182 F. Supp. 3d at 933.

Because Toro Company has not demonstrated that Yakta is closely related to the disputes arising out the Agreements, the Court declines to apply the closely-related doctrine.  Additionally, Yakta does not have minimum contacts with Minnesota.  For those reasons, the Court concludes that it does not have personal jurisdiction over Yakta. Because the Court does not have personal jurisdiction over Yakta, the Court need not address whether Toro Company has failed to state a claim against Yakta.

II.     **Preliminary Injunction**

The Court next turns to Toro Company's request for a TRO and/or a preliminary injunction.  In determining whether to grant a TRO or preliminary injunction, the Court considers the following:  "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  The burden is on the movant to establish that injunctive relief is appropriate.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

The first factor the Court must consider is whether there is a threat of irreparable harm to the movant.  "[T]he basis of injunctive relief in federal courts has always been irreparable harm and inadequacy of legal remedies."  *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (internal quotations and citation omitted).  "When there is an adequate remedy at law, a preliminary injunction is not appropriate."  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Toro Company alleges that Sutterlin and Angel are currently engaging in a solicitation by proxy scheme in violation of their Agreements and have violated their duty of loyalty.  Toro Company has provided evidence that Sutterlin and Angel both reached out to dealers while still employed with Toro Company to encourage the dealers to buy Yakta mowers.  (Doc. No. 21-1 at 14, 28.)  Moreover, texts between Sutterlin and Angel established a plan for the two to tee up their prior dealers for each other, in violation of their Agreements.  (*Id.* at 9-11.)  Sutterlin and Angel's prior dealers include

dealers A, B, C, D, E, F, and G, and all of these dealers are now listed as current Yakta dealers.  (Doc. No. 21 ¶ 25.)

"A review of the relevant case law shows that in the context of a plaintiff's valid agreement not to compete with a defendant, Eighth Circuit courts have found irreparable harm when a defendant affirmatively solicits business from a plaintiff's customers or clients."  *Mercy Health Servs.-Inc. v. Efstratiadis*, 579 F. Supp. 3d 1096, 1105 (N.D. Iowa 2022) (citing cases).  The evidence here shows that Sutterlin and Angel created a plan to indirectly solicit business with their prior dealers, in violation of their Agreements with Toro Company.  Their prior dealers are now listed as current Yakta dealers. Moreover, there is evidence that Sutterlin even attempted to get one of his prior dealers to commit to purchasing Yakta mowers while he was still employed with Toro Company. The Court concludes that this is enough to establish irreparable harm.  *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) (holding that irreparable harm had been shown when "[t]he district court found that the individual defendants were each affirmatively soliciting business" in violation of their noncompete agreements).

Additionally, the Court concludes that Toro Company will likely succeed on the merits.  Toro Company has shown that Sutterlin and Angel likely breached their duty of loyalty.  While employed at Toro Company, Sutterlin texted Angel that he got one of his dealers to commit to purchasing Yakta mowers.  (Doc. No. 21-1 at 14.)  While Angel was still employed at Toro Company and in the process of negotiating employment with Yakta, Angel also reached out to have dinner with a dealer.  (*Id.* at 28.)  That dealer is now listed as dealers for Yakta.  (Doc. No. 21 ¶¶ 46-48.)  The Court further concludes

that Toro Company has likely demonstrated a breach of contract. Both Sutterlin and Angel signed Agreements to not solicit business directly or indirectly with dealers they worked with for the past three years of their employment with Toro Company. Text messages between Sutterlin and Angel demonstrate that Sutterlin and Angel created a plan to tee up their prior dealers for each other, in violation of these Agreements. And while Defendants assert that there is no evidence that "Sutterlin and Angel did anything in furtherance of any 'proxy' theory" (Doc. No. 32 at 21), their prior dealers, A, B, C, D, E, F, and G, are now listed as dealers for Yakta.

Angel also mentioned certain hoops that he would have to jump through, again implying that he was attempting to get around the Agreements. Lastly, the Agreements prohibited Angel and Sutterlin from attempting to solicit a Toro Company employee for other employment, and the evidence shows that Sutterlin called Toro Company employee Nikki Smith in November 2023 to suggest her taking a remote job at Yakta. (Doc. No. 24 ¶ 3.) Overall, the Court concludes that Toro Company has shown that Angel and Sutterlin likely breached their duty of loyalty and breached their Agreements with Toro Company.

Defendants argue that the Agreements are not valid because they are contracts of adhesion. In support of this argument, Defendants cite a footnote from a dissent which describes contracts of adhesion under Missouri law. *See Plant v. Wilbur*, 47 S.W.3d 889, 895 n.2 (Ark. 2001). The Court does not find this argument to be persuasive. Moreover, Defendants assert that there was not adequate consideration; however, Sutterlin received a $6,000 bonus while the Agreement for Angel was a condition of his employment. And

while Defendants assert that, under Arkansas law, non-compete agreements cannot be used to eliminate competition, these Agreements are limited to specific geographic regions and dealers and there is no evidence that Sutterlin and Angel are unable to earn a livelihood because of these Agreements.  Given the current record, Defendants have not demonstrated at this point that they are likely to prove that the Agreements are invalid.

The Court must next determine whether the balance of equities favors an injunction.  "In balancing the equities, [the Court] weigh[s] the threat of irreparable harm shown by the movant against the injury that granting the injunction will inflict on other parties." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (internal quotations and citation omitted).  Toro Company requests that the injunction require Angel and Sutterlin to stop working at Yakta.  The Court concludes that this goes too far, especially considering the scope of the noncompete within the Agreements.  A more limited injunction, however, would limit the harm to Angel and Sutterlin while still protecting Toro Company's interests.  Thus, the Court concludes that as part of the injunction, both Sutterlin and Angel are prohibited from working directly or indirectly with dealers A, B, C, D, E, F, and G during the pendency of this action.[2]  In addition, Sutterlin and Angel are ordered to abide by their non-compete agreements and Angel is required to certify to Toro Company that he has permanently deleted the

---

[2]     The Court assumes there will be significant discovery in the case, especially given the allegations of presale agreements.  Depending on what evidence comes to light regarding the extent of the alleged solicitation by proxy scheme and the amount, timing, and terms of any presale agreements, the Court would consider expanding the scope of the injunction.

spreadsheet(s) he sent to his personal email.  Finally, the Court concludes that public interest supports this injunction, as the injunction strikes a reasonable balance between protecting Toro Company's interests and not overly infringing on Angel and Sutterlin's rights.

The Court must also consider a bond.  Rule 65(c) of the Federal Rules of Civil Procedure requires the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  The bulk of this injunction merely requires Sutterlin and Angel to comply with the Agreements.  The only addition is that Sutterlin and Angel are now prohibited from working with each other's prior dealers.  Because Sutterlin and Angel are allowed to maintain work at Yakta and may continue to conduct sales so long as they comply with their Agreements and do not sell to Dealers A through G, the Court concludes that the cost of the injunction is not significant.  The Court will therefore impose a bond of $150,000.00.

**ORDER**

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' motion to dismiss is (Doc. No. [12]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.     Defendants' motion to dismiss the action for lack of subject matter jurisdiction is **DENIED.**

16

b.      Defendants' motion to dismiss Defendant Yakta for lack of personal jurisdiction is **GRANTED.**  Accordingly, Toro Company's claim against Yakta is **DIMISSED WITHOUT PREJUDICE.**  Defendant Yakta is **TERMINATED** as a Defendant.

c.      Defendants' motion to dismiss Toro Company's claim against Yakta for failure to state a claim is **DENIED AS MOOT.**

2.      Toro Company's motion for a TRO/Preliminary injunction (Doc. No. [18]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      Sutterlin and Angel are prohibited from working directly or indirectly with dealers A, B, C, D, E, F, G.

b.      Sutterlin and Angel are ordered to abide by their non-compete agreements.

c.      Angel is required to certify to Toro Company that he has permanently deleted the spreadsheet(s) he sent to his personal email.

3.      Toro Company is ordered to file a bond in the amount of $150,000.00.  The Preliminary Injunction will take effect upon the filing of this bond.

4.      The Court directs the parties to contact Magistrate Judge Wright's chambers within 10 days of this Order to address any discovery or scheduling issues pursuant to Rule 16.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 5, 2024                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge

17